Argued and submitted November 30, 2010, reversed and remanded
August 17, 2011

## STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

## PRESSLEY DOWANE WIGGINS, JR.,
*Defendant-Respondent.*

Douglas County Circuit Court
08CR1481FE; A141607

260 P3d 826

Janet A. Klapstein, Senior Assistant Attorney General, argued the cause for appellant. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Daniel C. Bennett, Deputy Public Defender, argued the cause for respondent. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Before Sercombe, Presiding Judge, and Brewer, Chief Judge, and Landau, Judge pro tempore.

SERCOMBE, P. J.

## SERCOMBE, P. J.

The state appeals from a pretrial order suppressing evidence discovered in a warrantless search of defendant's car. The state argues that the search fell under an exception to the warrant requirement of Article I, section 9, of the Oregon Constitution and, therefore, did not violate defendant's constitutional rights.[1] We conclude that the search was justified by the "automobile exception" to the warrant requirement. Accordingly, we reverse and remand.

We state the facts consistently with the trial court's express and implied findings. *State v. Meharry*, 342 Or 173, 175, 149 P3d 1155 (2006). At about 7:50 p.m., the Myrtle Creek Police Department received a complaint of a verbal altercation at a residence on Conrad Street. The caller, a neighbor, had overheard a person state that he was a member of the Hell's Angels motorcycle gang, that he was going to get a gun, and that he would return to the residence. The caller reported that the person making that statement had left in a black passenger car with California license plates.

Fifteen minutes later, Officer Brewster of the Myrtle Creek Police Department located the car in the parking lot of a convenience store. While waiting for backup to arrive, Brewster observed defendant exit the vehicle, enter the store, and then return to the vehicle a short time later. Defendant then pulled out of the parking lot, making an unsignaled turn, and drove in the direction of Conrad Street. Brewster followed. Deputy Feland of the Douglas County Sheriff's Office soon arrived as backup and followed Brewster in his vehicle.

Brewster then initiated a traffic stop of defendant. Defendant pulled his car to the side of the road, and Brewster parked behind defendant. Brewster exited his vehicle with his gun drawn at his side. As he did so, defendant drove forward about 30 feet and then pulled into a driveway at 1063

---

[1] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Hill Street. Brewster returned to his vehicle, pulled forward, and again exited his vehicle with his gun drawn at his side. Feland also exited his vehicle with his gun drawn. Brewster approached the rear of defendant's car, and ordered defendant to place his hands outside the driver's side window. Defendant at first complied, but briefly drew his right hand back inside the car. Brewster then ordered defendant out of the car, and defendant complied. Brewster handcuffed defendant for safety reasons and advised him of his *Miranda* rights, but explained that he was not under arrest.

Brewster told defendant that he was being stopped for traffic violations, although Brewster was more concerned with the possibility that defendant possessed a gun and was headed back to Conrad Street. Brewster asked defendant if he had been involved in a "disturbance" on Conrad Street. Defendant at first denied, but soon thereafter admitted, that he was involved in a dispute on Conrad Street. Defendant, however, did not admit to making any threats and denied being a member of the Hell's Angels. Brewster sought consent to search defendant's car for firearms. Defendant declined to give consent.

By that time, a second deputy, Williams, had arrived on the scene. Williams ran a records check on defendant and discovered that he was on parole and that his conditions of parole included a "no alcohol clause."[2] Brewster could smell alcohol on defendant's breath. Williams contacted defendant's parole officer, who was advised of the situation. The parole officer, through Williams, directed defendant to consent to the search of his car. Defendant again denied consent. Brewster then arrested defendant for the parole violation.

As he was being arrested, defendant shouted at the residents of 1063 Hill Street—Clawson and Reedy, who were apparently friends of defendant—to call defendant's girlfriend, Watson, and to tell her to pick up defendant's car. Defendant also requested that his car keys be given to Clawson or Reedy. Brewster gave the keys to Clawson as

---

[2] Defendant was under a term of supervision for a prior crime. That term of supervision is variously referred to in the record as "parole," "probation," or "post-prison supervision." For ease of reference, we refer to the term of supervision as "parole."

defendant requested. At about 9:10 p.m., Brewster transported defendant to the Douglas County Jail. Defendant's car was left locked, albeit with a window down, in the driveway at 1063 Hill Street.

Feland and Williams, meanwhile, went to Watson's residence to further investigate the possibility that a gun was in the car. Watson indicated that she kept guns in the house but, after conducting a search, was unable to locate them. Defendant was staying at the house and had access to the guns. In light of that information, Williams believed that a gun was likely in defendant's car. Consequently, Williams left to secure the car, reaching the vehicle at 9:35 p.m. The car was therefore unattended for about 25 minutes. However, Reedy and Clawson were adamant that nobody had accessed the car while it was unattended.

Feland, who remained at Watson's residence, asked Watson to call defendant at the jail while Feland listened in. Watson agreed. During the ensuing telephone conversation, defendant revealed that there was a gun in the car. He also asked Watson to retrieve the car and make sure nobody had access to it. Alternatively, he asked her to offer Reedy several hundred dollars to leave the car in his driveway for a few days.

Armed with that information, Feland contacted his supervisor at around 10:00 p.m. in order to apply for a search warrant. In Feland's view, he had probable cause to believe that a gun was in defendant's car and that defendant had committed the crime of felon in possession of a firearm, ORS 166.270. Feland also contacted Williams and told him to guard the car. Feland then returned to 1063 Hill Street, where the car was located. Brewster had also returned to defendant's car by that time.

Watson showed up at defendant's car at around 10:40 p.m., demanding to take the vehicle. The officers told her she could not take the vehicle. She appeared agitated, approached the car with keys in her hand, and reached for the door. The officers physically obstructed the driver's side door, but they made no physical contact with Watson. Eventually the officers were able to subdue Watson, although she continued to insist on taking the car.

After consulting with their supervisor, the officers determined that exigent circumstances now justified searching the car without a warrant. The officers searched the car and found a loaded gun on the floorboard behind the passenger seat, hidden beneath a sun shade. They also found a gun case containing additional ammunition on the back seat of the car. The officers seized the evidence and then released the car to Watson.

Defendant was subsequently charged with one count of felon in possession of a firearm, ORS 166.270, and one count of unlawful possession of a firearm, ORS 166.250. Prior to trial, defendant moved to suppress the evidence obtained in the warrantless search of his car, arguing that the search violated his rights under Article I, section 9. The state argued that the search was justified by the automobile exception to the warrant requirement. The trial court concluded that the warrantless search was not justified by the automobile exception or other exigent circumstances. Consequently, it granted defendant's motion to suppress.

On appeal, the state argues that there were individualized exigent circumstances—namely, the risk of loss of evidence presented by the arrival of defendant's girlfriend—that justified warrantless entry into the vehicle. The state further argues that, although the car was parked and unoccupied for a period of time, the circumstances nonetheless gave rise to the "automobile exception" to the warrant requirement because of the "active interference by Watson [and] the mobility of the vehicle."[3] Defendant responds that the automobile exception did not apply because the officers broke contact with the vehicle and that, upon their return, the vehicle was no longer "mobile" within the meaning of our case law. Moreover, defendant contends that there were no other exigent circumstances at the time of the search because the officers had "gained Watson's compliance" and the vehicle was secured. Thus, in defendant's view, the officers should

_____

[3] Defendant argues that the state did not raise that argument in its opening brief. We disagree. Although the state's brief contains equivocal statements regarding the automobile exception, it did argue that this case "carries the same underlying concerns" as the automobile exception and cited several cases on point. Moreover, that argument was preserved below and the trial court directly addressed it.

have continued to guard the vehicle until a warrant could be obtained.

Under Article I, section 9, a warrantless search is *per se* unreasonable unless it falls within "one of the few specifically established and carefully delineated exceptions to the warrant requirement." *State v. Snow*, 337 Or 219, 223, 94 P3d 872 (2004) (citation and internal quotation marks omitted). One of those exceptions is the "exigent circumstances exception," which permits police to conduct a warrantless search where both probable cause and exigent circumstances exist. *Id.* "Exigent circumstances include, among other things, situations in which immediate action is necessary to prevent the disappearance, dissipation, or destruction of evidence." *Meharry*, 342 Or at 177 (citation omitted). The automobile exception is "a subset of the exigent circumstances exception" under which the "mobility of a vehicle, by itself, creates an exigency." *Id.* That exception recognizes the rapidity and ease with which a vehicle can be moved before officers are able to obtain a warrant. *Id.*

Under the automobile exception, police may conduct a warrantless search of a vehicle where "(1) * * * the automobile is mobile at the time it is stopped by police or other governmental authority, and (2) * * * probable cause exists for the search of the vehicle." *State v. Brown*, 301 Or 268, 274, 721 P2d 1357 (1986). Recent cases have clarified that "a vehicle is 'mobile' for purposes of the automobile exception as long as it is operable." *State v. Kurokawa-Lasciak*, 237 Or App 492, 497-98, 239 P3d 1046 (2010), *rev allowed*, 349 Or 654 (2011); *see also State v. Groom*, 239 Or App 462, 244 P3d 913 (2010). A car that is operable is considered to be "mobile" even if the car has been effectively seized and the defendant is under arrest at the time the search is conducted. *See Meharry*, 342 Or at 180 (explaining that, although the defendant had been arrested and her van was blocked by a police vehicle, the van was mobile because the officer "had not impounded the van, and there was no physical or mechanical impediment to the van's being driven away once [the officer] relinquished control over it"); *Brown*, 301 Or at 278 (automobile exception applied even though "the defendant was under arrest and in police custody and * * * the car was

under police control when the search was conducted"). However, the automobile exception is inapplicable and a vehicle is not considered to be "mobile" where the vehicle is functionally disabled, the vehicle has been or is in the process of being impounded, or the officers do not focus attention on the vehicle until after they have established probable cause to detain the defendant. *Kurokawa-Lasciak*, 237 Or App at 498.

Here, there is no dispute that the police had probable cause that defendant's car contained evidence of a crime—a gun—at the time of the search. The only remaining question, then, is whether defendant's vehicle was "mobile" *at the time the officers first encountered it. Compare State v. Coleman*, 167 Or App 86, 94, 2 P3d 399 (2000) ("The inquiry is centered on the circumstances surrounding the moment *when the police first notice or focus their attention on an automobile.*" (Emphasis added.)), *with Meharry*, 342 Or at 178 ("[A] vehicle is mobile for the purposes of the automobile exception *because it was moving when the officer stopped it* and nothing demonstrated that the vehicle would not be mobile once the officer relinquished control over it." (Emphasis added.)). We conclude that defendant's car was mobile, whether we define the initial point of the encounter as the moment when Brewster first observed defendant's car in the parking lot of the convenience store or the moment when Brewster subsequently stopped defendant's moving vehicle. In either case, the car was occupied and operable, and nothing subsequent to the stop rendered the car incapable of mobility.

We reject defendant's argument that the vehicle was stripped of its mobility because the officers broke contact with it. In *Kurokawa-Lasciak*, the defendant, who was suspected of money laundering, had parked his van in a casino parking lot. 237 Or App at 494. He was about 30 feet from his van when an officer stopped him. *Id.* The officer asked for consent to search the van, which the defendant denied. *Id.* at 495. The defendant was subsequently arrested and transported to the local jail. *Id.* When the officer returned to the casino, he questioned the defendant's girlfriend, who stated that she had the keys to the van and intended to drive it away. *Id.* Ultimately, the officer conducted a warrantless search of the van, and evidence of drug crimes was found

inside. *Id*. at 495-96. Despite the lapse in time and apparent break in contact with the vehicle, we concluded that the automobile exception applied: The defendant's vehicle was operable at the time the officers first encountered it, the vehicle had not been impounded, and the officers first focused their attention on the vehicle before probable cause to arrest the defendant had developed. *Id.* at 499.

Similarly, here, defendant's car was mobile when it was stopped by Brewster. The stop occurred prior to defendant's arrest. Brewster focused his attention on the vehicle immediately, asking defendant for consent to search the car for firearms. The car continued to be the subject of the officers' ongoing investigation despite a temporary break in contact. Nothing occurred between the moment of the initial encounter and the time the officers searched defendant's car that rendered the vehicle immobile. The car had not been impounded, the car was not functionally disabled, and nothing prevented the car from being driven away once the officers relinquished control over it. In short, defendant's vehicle was mobile at the time of the initial encounter and remained mobile thereafter. The officer's warrantless search was therefore permissible pursuant to the automobile exception. The trial court erred in concluding otherwise.

Reversed and remanded.