Argued and submitted March 6, reargued and submitted en banc October 1,
2014, reversed and remanded March 18, petition for review allowed
July 30, 2015 (357 Or 595)

### STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

### BELL MURPHY ANDERSEN,
*Defendant-Appellant.*

Washington County Circuit Court
C111600CR; A150872

346 P3d 1224

Jonah Morningstar argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Susan G. Howe, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Haselton, Chief Judge, and Armstrong, Ortega, Sercombe, Duncan, Nakamoto, Hadlock, Egan, DeVore, Tookey, Garrett, and Flynn, Judges, and Wollheim, Senior Judge.

ARMSTRONG, J.

DeVore, J., dissenting.

## ARMSTRONG, J.

Defendant appeals a judgment of conviction for unlawful delivery of methamphetamine that was based on evidence obtained from a warrantless search of defendant's Jeep. Defendant assigns error to the trial court's denial of her motion to suppress evidence, arguing that the automobile exception to the warrant requirement did not apply to the search of her Jeep and, hence, that the search violated Article I, section 9, of the Oregon Constitution. We agree with defendant and reverse her conviction.

A Beaverton police officer, McNair, arranged a drug transaction between an informant and Compton, a suspect in drug activity for whom an arrest warrant had been issued. Compton agreed to meet the informant to facilitate the purchase of half an ounce of methamphetamine. Compton served in the deal as a drug broker, telling the informant that defendant would supply the drugs. Compton told the informant to look for a silver Jeep or a red sedan in a WinCo parking lot.

Henderson, a plainclothes officer, circled the WinCo parking lot in an unmarked car, awaiting the transaction. When he returned to the front area of the parking lot, he saw a silver Jeep that had not been there a minute before. The Jeep had stopped some distance away from other vehicles and was positioned askew, across several parking spaces. Henderson watched Compton speak to the occupants and then lean through the open passenger window. Henderson advised other officers of what he believed to be a drug transaction. The officers approached and arrested Compton on the outstanding warrant. Defendant sat in the driver's seat of the Jeep with the engine running while the police arrested Compton. Defendant asked if she could leave, and McNair said that she could not because she was a subject of a police investigation. Defendant told McNair that she did not want to get out of the Jeep. McNair was concerned, however, about a sheathed dagger on the rear passenger floorboard at the feet of a passenger and ordered everyone in the Jeep to step out of it.

Although she initially refused, defendant ultimately agreed to allow a drug dog to sniff the exterior of the Jeep. The dog sniffed the outside of the Jeep and twice

alerted officers to the presence of drugs. Based on the dog's responses, the officers decided to search the interior of the Jeep. Inside the Jeep, the dog alerted to defendant's purse, in which the police found half an ounce of methamphetamine and a lipstick case containing additional drugs. The state subsequently charged defendant with both unlawful possession and unlawful delivery of methamphetamine.

Before trial, defendant moved to suppress all evidence obtained from the search of the Jeep, arguing that the automobile exception to the warrant requirement did not apply to the search and, hence, that the search violated Article I, section 9. The trial court denied defendant's motion. It determined that the automobile exception applied because the Jeep was mobile when the police first encountered it even though it was not moving at that time. A jury convicted defendant of the charged crimes, which led the court to enter a judgment that merged the crimes into a single conviction for unlawful delivery of methamphetamine. Defendant appeals the judgment, assigning error to the denial of her suppression motion.

Article I, section 9, guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure."[1] Under that provision, a search or seizure conducted without a warrant is unreasonable and, hence, violates the guarantee unless it comes "within one of the few specifically established and carefully delineated exceptions to the warrant requirement." *State v. Bridewell*, 306 Or 231, 235, 759 P2d 1054 (1988). One of those exceptions is the exigent-circumstances exception, which allows the police to conduct a warrantless search or seizure if it is supported by probable cause and conducted under exigent circumstances. For purposes of the exception, exigent circumstances are those that require the police to act to prevent the loss or destruction of evidence or contraband when they cannot get a warrant before acting.

---

[1] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The Oregon Supreme Court established the Oregon automobile exception as a subcategory of the exigent-circumstances exception in 1986 in *State v. Brown*, 301 Or 268, 721 P2d 1357 (1986). Before the court created the automobile exception, Oregon police officers who stopped a car that they had probable cause to believe contained evidence of a crime or contraband had to determine whether, in the absence of consent to search the car, exigent circumstances made it necessary for them to seize the car and obtain a warrant to search it or to seize and search the car without a warrant if it was not feasible for them to apply for a warrant.

The court established the Oregon automobile exception in *Brown* as a "'*per se* exigency rule.'" *Id.* at 277. Under the exception articulated in *Brown*, police who have lawfully brought a moving automobile to a stop have authority to search it without a warrant if they have probable cause to believe that the automobile contains crime evidence or contraband. *Id.* at 276. It is the mobility of the automobile at the time that the police stop it that establishes the exigency.

The *Brown* court acknowledged the importance of the warrant requirement and anticipated that technological advances would likely soon allow "the warrant requirement of the state and federal constitutions [to] be fulfilled virtually without exception." *Id.* at 278 n 6. It nonetheless chose to create the Oregon automobile exception because it believed that the police "need clear guidelines by which they can gauge and regulate their conduct rather than trying to follow a complex set of rules dependent upon particular facts regarding the time, location and manner of highway stops." *Id.* at 277.

An automobile that is mobile can mean one that is movable, that is, capable of moving, as well as one that is moving.[2] *Brown* dealt with an automobile that was moving when the police stopped its driver and, hence, brought it to a stop. Three months after *Brown*, the court considered in *State v. Kock*, 302 Or 29, 725 P2d 1285 (1986), whether the Oregon automobile exception applied to an automobile

---

[2] *See, e.g., Webster's Third New Int'l Dictionary* 1450 (unabridged ed 2002) (defining "mobile" to mean, among other things, "a movable or moving body or part : one that is mobile").

that was not moving but was movable when the police first encountered it in connection with a crime.

In *Kock*, the defendant's employer suspected that the defendant was stealing merchandise from the store at which the defendant worked and arranged for police officers to stake out the store parking lot during the defendant's work shift, which was roughly from 4:00 a.m. to 6:30 a.m. while the store was closed. The officers saw the defendant park his car in the lot before 4:00 a.m. and enter the store without carrying anything with him. He came out of the store at 5:42 a.m. pushing a floor-washing machine with a two-foot long brown box on top that was covered by a newspaper. He left the machine at a loading dock, took the box to his car, removed a package from the box, placed the package behind the passenger seat of his car, and partially covered the package with a pair of pants. After smoking a cigarette, the defendant re-entered the store with the machine, box, and newspaper. Believing that the package that the defendant had placed in his car was merchandise that he had stolen from the store, the police opened the door to the defendant's car and seized the package, which turned out to contain diapers. After obtaining additional police support, the police entered the store and arrested the defendant for theft. The trial court denied the defendant's motion to suppress the evidence obtained from the warrantless search of his car, and we affirmed.

The Supreme Court reversed, concluding, among other things, that the search of the car did not come within the Oregon automobile exception. It explained:

"[W]e emphasized in [*Brown*] that we were not confronted with the search of a vehicle that was not mobile or that had not just been lawfully stopped by a police officer. We are now confronted with such a case. Although logically it can be argued that the rationale of the seminal case of *Carroll v. United States*, 267 US 132, 45 S Ct 280, 69 L Ed 543 (1925), and its progeny * * * would justify extending the automobile exception to automobiles that are capable of mobility, we elect to draw the so-called bright line of *Brown* just where we left it in that case: * * * [A]*utomobiles that have just been lawfully stopped by police may be searched without a warrant and without a demonstration*

*of exigent circumstances when police have probable cause to believe that the automobile contains contraband or crime evidence.* In this case, we assume for the sake of argument that there was probable cause for the search of the automobile. We nevertheless hold that any search of an automobile that was parked, immobile and unoccupied at the time the police first encountered it in connection with the investigation of a crime must be authorized by a warrant issued by a magistrate or, alternatively, the prosecution must demonstrate that exigent circumstances other than the potential mobility of the automobile exist."

*Kock*, 302 Or at 32-33 (emphasis added).

In other words, the Oregon automobile exception established in *Brown* to which the court adhered in *Kock* applies to automobiles that have just been lawfully brought to a stop by the police, that is, to automobiles that are moving when stopped by the police. It does not apply to automobiles that are parked, immobile, and unoccupied when first encountered by the police in connection with a crime.

The Supreme Court next confronted the reach of the Oregon automobile exception twenty years after *Brown* and *Kock* in *State v. Meharry*, 342 Or 173, 149 P3d 1155 (2006). In *Meharry*, the fire chief of the City of Umatilla saw the defendant driving her van erratically in Umatilla and noticed that a child was moving from side to side in the back seat of the van. The fire chief called the Umatilla police department on his cell phone while following the defendant. The defendant eventually drove into the parking lot of a convenience store, parked her van, and entered the store. The chief followed the defendant into the parking lot and parked next to the defendant's van.

A Umatilla police officer responded to the chief's call and drove out of the parking lot of the police department as the defendant and the chief drove by him. The officer watched as the defendant pulled into the convenience-store parking lot. He followed the defendant into the parking lot in time to see her get out of her van and enter the store. The officer parked his patrol car behind the defendant's van, saw the child in the van, spoke briefly with the chief, and then followed the defendant into the store. The officer ultimately arrested the defendant for driving under the influence of

intoxicants and searched the defendant's van for evidence of that crime, which led to the discovery of evidence that provided the basis for the state to charge the defendant with a number of crimes.

Before trial, the defendant moved to suppress the evidence obtained from the warrantless search of her van. The trial court granted the motion, and we affirmed. On review, the Supreme Court concluded that the search of the van came within the Oregon automobile exception and, hence, that the trial court had erred in granting the defendant's suppression motion.

Both we and the trial court had concluded that the van was not mobile when the police officer first encountered it in connection with a crime because the van was parked in the store parking lot when the officer parked his patrol car behind the van and confronted the defendant in the store. The Supreme Court rejected that conclusion, reasoning that the officer

> "first encountered defendant's van in connection with a crime when he saw her drive by the police station. At that point, the van was mobile and [the fire chief's] reported observations gave [the officer] reasonable suspicion to believe that defendant was driving under the influence of intoxicants."

*Id.* at 179.

Further, although the officer had not stopped the defendant and, hence, her van while the van was moving, as the officer had done in stopping the car in *Brown*, the court did not believe that that difference affected the exigency on which the *Brown* court had based the Oregon automobile exception. The van in *Meharry* was as mobile at the time of the search as was the car in *Brown* notwithstanding that difference, in that both could readily be moved "'"out of the locality or jurisdiction in which the warrant must be sought."'" *Id.* at 180 (quoting *Brown*, 301 Or at 275 (quoting *Carroll*, 267 US at 153)).

As the Supreme Court subsequently confirmed in *State v. Kurokawa-Lasciak*, 351 Or 179, 263 P3d 336 (2011), the effect of *Meharry* was twofold. It established that the

Oregon automobile exception does not require the police to bring a moving vehicle to a stop in order for the exception to apply. In other words, the exception is not limited to the search of vehicles that have just been lawfully brought to a stop. However, for a vehicle that was not moving when stopped by the police, the exception requires the vehicle to be mobile when the police first encounter it in connection with a crime and, as in *Meharry*, that means that the vehicle must be moving at the time of the encounter for the exception to apply.

The Supreme Court had to revisit the application of the Oregon automobile exception in *Kurokawa-Lasciak* because, relying on *Meharry* and several of our own cases, we had held in *Kurokawa-Lasciak* that "'a vehicle is "mobile" for purposes of the automobile exception as long as it is operable,'" 351 Or at 185 (quoting *State v. Kurokawa-Lasciak*, 237 Or App 492, 497-98, 239 P3d 1046 (2010), *rev'd*, 351 Or 179 (2011)), and, based on that understanding, we had upheld under the automobile exception a search of a van that was parked, immobile, and unoccupied when the police first encountered it in connection with a crime. Neither the defendant nor the state agreed with our interpretation of *Meharry*. As for the state, it framed the question on review as one that was "left open" after *Meharry—viz.*,

> "'when officers first encounter a car in connection with a crime, does the automobile exception's "mobility" requirement demand evidence that the officers saw the car being driven, *or is it enough that (1) officers develop probable cause that the car contains evidence of a crime, and (2) no evidence exists that the car is inoperable?*'"

*Id.* at 186.

In answering that question, the court undertook an extensive review of its cases that had created and applied the Oregon automobile exception, namely *Brown*, *Kock*, and *Meharry*. Its review led it to emphasize two basic themes. First, the Oregon exception is a narrow exception that is intended to create a bright-line rule to guide the police and citizens regarding the warrantless search of automobiles that are subject to the exception while otherwise recognizing the importance of "the constitutional requirement that

a neutral magistrate, and not officers in the field, determine the existence of probable cause to search." *Id.* at 193.

Second, the bright line that the court had drawn to identify automobiles that are subject to search under the Oregon exception—*viz.*, that they had to be mobile when first encountered in connection with a crime—could logically be drawn elsewhere. As the court explained, the *Kock* court had acknowledged

> "that, logically, the defendant's parked vehicle was as capable of mobility as was a vehicle that was moving when it was stopped by the police, and that the United States Supreme Court had interpreted the warrant requirement of the federal constitution to permit warrantless searches of automobiles 'capable' of mobility. [*Kock*, 302 Or] at 32. However, the court specifically elected not to adopt the Supreme Court's rationale or to extend the Oregon exception. Instead, the court chose to 'draw the so-called bright line of *Brown* just where [it] left it in that case[.]' *Id.* at 32-33."

*Kurokawa-Lasciak*, 351 Or at 189-90 (footnote omitted).

Those principles provide the underpinning for the distinction that the *Kurokawa-Lasciak* court said was crucial to its decision in *Meharry*. The van in *Meharry* came within the Oregon automobile exception because of its status when the officer first encountered it in connection with a crime—*viz.*, when it was moving. The van's status when the officer parked behind it in the parking lot of the convenience store—*viz.*, parked within moments of the officer's arrival, occupied by a passenger, and with the driver running an errand in the store who would promptly have driven the van away had the officer not intervened—was insufficient to bring the van within the exception. *Id.* at 191-93.

The distinction in the van's status that the *Kurokawa-Lasciak* court identified is strictly binary, which is consistent with the two meanings of the word "mobile," *viz.*, moving and movable. The van in *Meharry* was moving—not movable or capable of mobility—when the officer first encountered it. The van was movable or capable of mobility—not moving—when it was in the parking lot. Hence, although the court did not put the point this way, the answer to the question that the state had posed on review in *Kurokawa-Lasciak*—whether

mobility for purposes of the Oregon exception requires officers to see the car being driven when they first encounter it in connection with a crime—is "Yes."[3]

Here, defendant's Jeep was parked in a parking lot when the officers first encountered it in connection with a crime. Although it had arrived in the parking lot within a minute of when the officers encountered it, had its engine running, and was occupied by a driver who presumably would promptly have driven it away had the officers not intervened, the Jeep was not moving when the officers encountered it, but, rather, was movable or capable of moving. It follows that the Jeep was not mobile for purposes of the Oregon automobile exception and, hence, was not subject to a warrantless search under the exception.

Although the search of the Jeep did not come within the *per se* exigency rule of Oregon's automobile exception, the Jeep might nonetheless have been subject to a warrantless seizure and search by the police under the exigent-circumstances exception to the warrant requirement. However, the state did not undertake to establish that the search was authorized under that exception or any other exception to the warrant requirement. Hence, the warrantless search of the Jeep violated Article I, section 9, and the trial court erred in denying defendant's motion to suppress the evidence obtained from the search.

The dissent disputes our conclusion. In its view, it is not necessary for a vehicle to be moving when the police first

---

[3] The court acknowledged that the distinction between a moving and movable car might seem somewhat contrived, but it nonetheless believed that the bright-line rule established in *Brown* and *Kock* had struck the appropriate balance under Article I, section 9:

"We acknowledge the logic of the state's position—that it is just as likely that a person in control of an operable car will drive off with evidence or contraband as will a person in control of a car that was mobile at the time of the initial encounter and that remains mobile thereafter. But we also are cognizant that, when the court recognized the automobile exception in 1986, it was careful to recognize a limited exception to the constitutional requirement that a neutral magistrate, and not officers in the field, determine the existence of probable cause to search. The court drew the 'bright line' that it did to benefit both the police and the citizens of this state. * * * Therefore, we adhere, as the court did in *Meharry*, to the line that the court drew in *Brown* and *Kock*."

*Kurokawa-Lasciak,* 351 Or at 193.

encounter it in connection with a crime—or, alternatively, for the police to bring it to a stop while it is moving—in order for the vehicle to come within the Oregon exception. According to the dissent, it is sufficient that the vehicle be one that has moved recently and that is occupied by a driver who would promptly drive it away if the police did not intervene.

As our discussion of *Kurokawa-Lasciak* and *Meharry* indicate, 269 Or App at 711-15, the dissent's understanding of the Oregon exception cannot be squared with the Supreme Court's conclusion in *Kurokawa-Lasciak* that the van in *Meharry* came within the Oregon exception because of its status when the police first encountered it in connection with a crime—that is, when it was moving—and *not* its status when the police encountered it in the parking lot. *Kurokawa-Lasciak*, 351 Or at 192-93. The driver in *Meharry* had parked her van in the convenience-store parking lot a minute or so before the officer arrived and parked his patrol car in the lot. By the time the officer arrived, the driver had left her van to go into the store to run an errand and had left a child in the van while she did that. The officer confronted and stopped the driver in the store, but, had the officer not stopped the driver at that point, she would have returned to her van and continued on her way. In other words, when the officer encountered the parked van in the parking lot, the van was not moving but it and its driver were in the midst of traveling from one place to another. Nonetheless, the court explained in *Kurokawa-Lasciak* that the status of the van in the parking lot was insufficient to bring the van within the Oregon exception. The van came within the exception *only* because of its status when the officer first encountered it in connection with a crime, which was when the van was being driven *to* the parking lot, that is, when it was moving. *Id.*

Here, when the police first encountered the Jeep in connection with a crime, it was parked in a store parking lot. It had arrived a minute before the police arrived, and the driver was in it with the engine running when the police stopped the driver. The only difference between the Jeep in this case and the van in the parking lot in *Meharry* is the location of their respective drivers. That difference bears on how quickly the two parked vehicles would have moved but for the intervention of the police, *viz.*, perhaps seconds for

the Jeep and a minute or two for the van, but that is not a difference that has (or can have) any significance to the application of the Oregon exception. Because the parked van in *Meharry* did not come within the Oregon exception based on its status when the police encountered it in the parking lot, it follows that the parked Jeep did not come within the exception, either.

The dissent disputes that the Oregon exception is based on a strictly binary distinction between vehicles that are moving and those that are movable when the police first encounter them in connection with a crime. However, the distinction is a necessary consequence of the Oregon Supreme Court's decision to establish an automobile exception as a form of *per se* exigency that is not coextensive with the federal exception and that identifies the circumstances that bring automobiles within the Oregon exception.

The standard that the dissent urges is similar to the standard for the federal automobile exception that the *Kock* court rejected. The *Kock* court identified *California v. Carney*, 471 US 386, 105 S Ct 2066, 85 L Ed 2d 406 (1985), as a case in which the United States Supreme Court had extended "the automobile exception to a stationary but operational vehicle in a public parking lot as being as readily mobile as one just stopped on a highway." *Kock*, 302 Or at 29. Tellingly, the vehicle in *Carney* was occupied by its driver in the parking lot when the police first encountered it in connection with a crime. *Carney*, 471 US at 387-88. Nonetheless, the *Kock* court rejected the federal standard embodied in *Carney*, which applies to vehicles that are movable when first encountered by the police in connection with a crime, for the Oregon standard established in *Brown*, which the *Kock* court identified as applying to "[s]earches of automobiles that have just been lawfully stopped by [the] police," *Kock*, 302 Or at 33, that is, to vehicles that are moving when the police stop them. As applied in *Kock*, that meant that a vehicle that had been parked by the defendant in his employer's parking lot two hours before the police connected the vehicle to a crime, and that would have been driven away by the defendant half an hour later at the end of his work shift, did not come within the Oregon exception. *See id*. at 31-34. The facts in *Kock* brought the vehicle within the

federal automobile exception and would likely have provided a basis for the state to justify the search as one that came within the exigent-circumstances exception to the warrant requirement, but those facts did not bring the vehicle within the Oregon automobile exception.

Of course, contrary to the *Kock* court's description of the Oregon automobile exception as one that applies to vehicles that the police have lawfully brought to a stop, *see Kock*, 302 Or at 33, the Oregon Supreme Court later made clear in *Meharry* that the police need not bring a moving vehicle to a stop in order for the Oregon exception to apply. However, as we have explained, the court subsequently made clear in *Kurokawa-Lasciak* that the application of the Oregon exception in *Meharry* depended on the status of the van when the police first encountered it in connection with a crime, which was when the van was moving.

By rejecting the application of the Oregon exception to vehicles that are movable or capable of moving when first encountered by the police, the Oregon Supreme Court necessarily was left with a standard of mobility that is focused on the alternative meaning of mobility, namely a "moving body or part," here, a moving vehicle. Tellingly, *no* Oregon Supreme Court case has applied that term to a vehicle that was *not* moving when first encountered by the police in connection with a crime or that was *not* lawfully brought to a stop by the police.

The dissent contends that a strict distinction between moving and movable vehicles operates to exclude from the Oregon exception vehicles whose functional status is indistinguishable from vehicles that come within the exception. We do not dispute that a bright-line rule that distinguishes between vehicles that are subject to a rule of *per se* exigency and those that are subject to an individualized assessment of exigency under the exigent-circumstances exception has that effect. As noted earlier, the van in the parking lot in *Meharry* is functionally equivalent to the Jeep in this case in terms of the likelihood and imminence of their respective movement. Nonetheless, as *Kurokawa-Lasciak* made clear, the status of the van in the parking lot in *Meharry*—*viz.*, parked, immobile, and unoccupied (by its

driver)—did not bring it within the Oregon exception. 351 Or at 192-93. It came within the exception because of its status when the police first encountered it in connection with a crime, which was when it was moving.

Finally, the dissent contends that our application of the Oregon exception in this case undermines the exception by requiring the police and courts to make individualized decisions about exigency in circumstances that the exception is intended to avoid. That is not correct. Our application of the Oregon exception simply preserves the distinction that the Oregon Supreme Court established in *Brown* and *Kock* and adhered to in *Meharry* and *Kurokawa-Lasciak*. Vehicles that come within the Oregon exception are subject to its *per se* exigency rule. Vehicles that come within the more expansive federal automobile exception are subject to the exigent-circumstances exception, which requires an individualized determination of exigency. We simply adhere to the balance between those two categories that the Supreme Court already has struck.

Because defendant's Jeep was parked in a store parking lot when the police first encountered it in connection with a crime and the police did not bring it to a stop, the Jeep was not subject to being searched under the Oregon automobile exception to the warrant requirement. The trial court erred in concluding otherwise and in denying defendant's suppression motion.

Reversed and remanded.

**DEVORE, J.,** dissenting.

If "to err is human," then to overcorrect should be forgivable.[1] Our majority opinion overcorrects. After the Court of Appeals drifted in 2010, deeming a vehicle searchable *sans* warrant because the vehicle is merely "operable," and prompted the Supreme Court to reverse,[2] we now overcorrect by requiring that the police must *see* a vehicle

---

[1] Apology to Alexander Pope, who wrote, "To err is human, to forgive divine." Alexander Pope, *An Essay on Criticism* (1711) reprinted in 1 *The Norton Anthology of English Literature* 2680 (9th ed 2012).

[2] *State v. Kurokawa-Lasciak*, 237 Or App 492, 497-98, 239 P3d 1046 (2010) (vehicle is mobile "as long as it is operable"), *rev'd*, 351 Or 179, 263 P3d 336 (2011).

*moving* in order that the vehicle may be treated as "mobile" for purpose of the automobile exception. 269 Or App at 712-13, 713-14, 715.

All agree that Oregon law permits a warrantless search of a vehicle when police encounter a vehicle that is mobile and when they have probable cause to search it. That vehicle should be recognized to remain mobile, although stopped, when it is still being operated, as here, with a driver at the wheel and the engine running, and when police have objective evidence that the vehicle has recently moved or is about to move. It should not matter that the driver and vehicle have stopped, paused, or are waiting. Because I believe the majority draws too narrow a conclusion from recent Supreme Court decisions, disregards prior statements of this court on point, and creates a new, unnecessary, and unrealistic rule, I respectfully dissent.

OREGON'S AUTOMOBILE EXCEPTION

The automobile exception to the warrant requirement allows that, "if police have probable cause to believe that a person's automobile, which is mobile when stopped by police, contains contraband or crime evidence," they may conduct a warrantless search of the vehicle for those items. *State v. Brown*, 301 Or 268, 276, 721 P2d 1357 (1986); *State v. Getzelman*, 178 Or App 591, 595, 39 P3d 195, *rev den*, 334 Or 289 (2002). Conversely, "any search of an automobile that was parked, immobile and unoccupied at the time the police first encountered it in connection with the investigation of a crime must be authorized by a warrant * * *." *State v. Kock*, 302 Or 29, 33, 725 P2d 1285 (1986). The automobile exception and its limit appeared as point and counterpoint in a pair of 1986 decisions from the Oregon Supreme Court. *Compare Brown*, 301 Or at 273-78 (automobile exception), *with Kock*, 302 Or at 33-34 (limitation). The exception's limit, which is at issue here, was drawn from a set of facts in *Kock* that were to recur twice in more recent decisions, *State v. Meharry*, 342 Or 173, 149 P3d 1155 (2006), and *State v. Kurokawa-Lasciak*, 351 Or 179, 263 P3d 336 (2011). After those decisions, we have applied the automobile exception to other situations. Those

decisions provide the guidance for the outcome for the new and inevitable case now at hand.

In *Brown*, the Supreme Court upheld the warrantless search of a car that had been moving when police stopped it. *See Brown*, 301 Or at 270, 277 (cautioning that "[w]e \*\*\* do not address in this opinion whether a warrant for the search and seizure of a parked or impounded automobile is required"). The court quickly faced the converse situation in *Kock*, 302 Or at 32 (recognizing that "[w]e are now confronted with such a case"). In *Kock*, two officers knew that the defendant lacked permission to take merchandise from his employer's store. Early one morning, the officers watched the defendant leave the store with a package of diapers, put it in his parked car, cover the package, and return to the store. They opened the car, seized the package, and arrested the defendant for theft. The trial court denied his motion to suppress. The Supreme Court reversed and remanded, refusing to extend the automobile exception to a stationary but operational vehicle in a parking lot. To be precise, the court held "that any search of an automobile that was *parked*, immobile, and *unoccupied* at the time the police first encountered it in connection with the investigation of a crime must be authorized by a warrant" or exigent circumstances. *Id.* at 33 (emphases added).

Recognizing that distinction, we observed that, "[i]f the car is *not moving*, nevertheless, it is considered to be *'mobile'* if it is *occupied* and operable when the police first encounter it." *State v. Warner*, 117 Or App 420, 423, 844 P2d 272 (1992) (emphases added) (citing *Kock* but reversing denial of suppression motion because the failing pickup truck had become inoperable by the time the officer was deemed to encounter it). Without saying so, the majority's decision necessarily rejects this statement from *Warner*, as well as a decision of this court on remarkably similar facts.

In *State v. Cromwell*, 109 Or App 654, 820 P2d 888 (1991), the police responded to a report of a prowler, noises in a yard, and a vehicle that had driven down a dead-end road. Police found a truck "parked in the middle of the roadway with its parking lights on" and with the defendant (the driver) and a companion inside. *Id.* at 656. The engine

was off. When the defendant admitted possessing a small amount of marijuana, an officer searched the truck to find methamphetamine, which resulted in the defendant's conviction for a controlled substance. We acknowledged that "potential mobility" would not justify the search, but we continued, "Defendant's truck was *not unoccupied* when the officers encountered it." *Id.* at 659 (emphasis added). We recognized that it was true that

> "[t]he truck was not actually in motion when police encountered it, but *to say that it was 'immobile' draws too fine a distinction. The truck was 'mobile' in that defendant could have driven away at any moment.* The fact that defendant had not yet turned the key was merely fortuitous. * * * The search of defendant's truck was lawful, and the trial court correctly denied his motion to suppress."

*Id.* (emphasis added). Unless this court was sorely mistaken or its rationale overruled, *Cromwell*, involving an occupied vehicle, should guide the case at hand.[3]

Rather than reject the idea, the Supreme Court borrowed a page from *Cromwell* when finding that a van "remained mobile" when stopped. In *Meharry*, a police officer had received a call about the defendant's erratic driving. 342 Or at 175. As the officer drove out of the police station, he happened to see the defendant's van pass in front of him. At that time, he had reasonable suspicion to suspect that the defendant was driving under the influence of intoxicants. *Id.* at 175-76. The defendant drove a block and one-half farther and parked at a convenience store. The officer arrived in time to watch her stagger into the store. Encountering her inside, he saw that she was in a stupor. After she failed field sobriety tests, the officer arrested her and searched her

---

[3] This court made a similar statement a few years later where the facts were a measure or two more challenging than either *Cromwell* or today's case. In *State v. Burr*, 136 Or App 140, 901 P2d 873, *rev den*, 322 Or 360 (1995), a deputy encountered a pickup truck on the shoulder of the road with four men standing around it. No one occupied the vehicle, and the deputy had no evidence of recent or imminent movement. Nevertheless, upholding a warrantless search, this court stated, "The requirement of mobility was met because defendants could have driven away in the pickup at any moment." *Id.* at 150. Judge Armstrong dissented, contending that the automobile exception should not apply unless the deputy had stopped the pickup while moving. *Id.* at 150-59 (Armstrong, J., dissenting).

van. *Id.* at 176. The search revealed syringes and medications for other people, leading to a variety of charges. *Id.* The trial court granted her motion to suppress. On review, the Supreme Court concluded that the van was "mobile" by looking at facts in a broader time frame than when the officer arrived on the scene.[4] *Id.* at 180-81. The court noted that the officer had reasonable suspicion when he first saw the van in motion passing the police station, although he did not then stop the van. *Id.* at 179. Consistently with our statement in *Cromwell*, the court continued:

> "The search occurred shortly after [the officer] had observed the van in motion and had parked his police car behind her van. Nothing occurred between that time and the search that rendered the van immobile. [The officer] had not impounded the van, and there was no physical or mechanical impediment to the van's being driven away once [the officer] relinquished control over it. In short, the van *remained mobile* and the exigency continued."

*Meharry*, 342 Or at 180 (emphasis added). The court was unpersuaded by the defendant's argument that the automobile exception could not apply because the officer had not stopped a moving car. The court responded:

> "The issue that defendant's argument thus poses is whether stopping an otherwise mobile car from resuming its journey (as [the officer] did here) differs for purposes of the automobile exception from causing a moving car to come to a stop (as the officer did in *Brown*).
>
> "We cannot see a difference, for constitutional purposes, between the two situations. The fact that [the officer] did not have time to effectuate a stop before defendant pulled into the Zip Trip parking lot but instead effectuated a stop by preventing defendant from continuing her journey does not make her van any less mobile, nor does it make it any less likely that her van—and any evidence inside the van—could have been moved once [the officer] relinquished control over it. Rather, the van *remained mobile,* and the circumstances in this case were as exigent as they were in *Brown*."

*Id.* at 180-81 (emphases added). The court reversed the suppression of the evidence.

---

[4] The court referred to *Brown* as describing the automobile exception as "a subset of the exigent circumstances exception[.]" *Meharry*, 342 Or at 177.

More recently, in *Kurokawa-Lasciak,* the Supreme Court reiterated that the contours of the automobile exception had not changed. The fact pattern resembled that in *Kock.* The defendant was gambling at a casino and was suspected of money laundering. The casino barred him from further cash transactions and posted his photo in cashier cages. The defendant reached through a cage and grabbed his photograph. He drove his van to a nearby gas station and returned to the casino parking lot, parked, and turned off the engine. No officers had seen the van move. The defendant got out of the van and walked toward the casino. A deputy arrived and stopped the defendant when he was about 30 feet away from his van. A trooper arrived and, after discussion, arrested the defendant for theft and disorderly conduct. At some point, the defendant gave his keys to his girlfriend with instructions to lock the van and wait for his return. *Id.* at 183. The defendant was taken to jail, and his van was left parked at the casino.[5] The trooper searched the van and found marijuana, hashish, electronic scales, and $48,000 in cash. *Kurokawa-Lasciak,* 351 Or at 184.

The trial court granted the defendant's motion to suppress the evidence. We reversed, concluding broadly that "a vehicle is 'mobile' for purposes of the automobile exception as long as it is *operable.*" *Kurokawa-Lasciak,* 237 Or App at 497-98 (emphasis added); *Kurokawa-Lasciak,* 351 Or at 179.

On review, however, the Supreme Court held that we erred in reading *Meharry* to have represented an "'expansive definition of the automobile exception,'" which had "'evolved'" since *Brown* and *Kock. Kurokawa-Lasciak,* 351 Or at 190 (quoting *Kurokawa-Lasciak,* 237 Or App at 499). The Supreme Court began:

> "In this case, we adhere to prior decisions of this court and decide that the 'automobile exception' to the warrant requirement of Article I, section 9, of the Oregon Constitution, does not permit a warrantless search of a defendant's vehicle when the vehicle is parked, immobile, and unoccupied at the time that the police encounter it in connection with a crime."

[5] The trooper engaged the girlfriend in a discussion about consent to search the van. In our initial decision, we did not reach the question of the validity of her consent, nor did the Supreme Court.

*Id.* at 181. The court recalled that *Kock* had deliberately declined to adopt the federal rule that had deemed a vehicle mobile and applied the automobile exception if the vehicle was simply "'capable' of mobility." *Id.* at 189. Instead, *Kock* had determined that Oregon's automobile exception would not apply when the automobile "'was parked, immobile and unoccupied.'" *Id.* at 190 (quoting *Kock*, 302 Or at 33). Accordingly, the Supreme Court rejected our impression of an "'expansive definition of the automobile exception[,]'" which led to "the proposition that 'a vehicle is "mobile" for purposes of the automobile exception as long as it is operable.'" *Id.* (quoting *Kurokawa-Lasciak*, 237 Or App at 497-98).

The Supreme Court explained that, in *Meharry*, it was important that the police officer had first seen the van while it was passing by. *Meharry*'s reference to operability or to the risk of the van's departure was not intended to make operability alone sufficient for a warrantless search. *Kurokawa-Lasciak*, 351 Or at 192-93. In other words, to say that a car has wheels, a tank of gas, and is mechanically sound is not enough to make a car "mobile" for purposes of Oregon's automobile exception. In *Kurokawa-Lasciak*, at the critical moment when the trooper first encountered the defendant, he was about 30 feet from his van, and, squarely within the limit described in *Kock*, the van was "parked, immobile, and unoccupied." Because those facts were not much different from those in *Kock*, the *Kock* limitation remained true. The Supreme Court held that the automobile exception could not justify a warrantless search of a van that was parked, immobile, and unoccupied. *Kurokawa-Lasciak*, 351 Or at 194.

After *Meharry* and *Kurokawa-Lasciak*, the decisions of this court do not suggest that the automobile exception had been narrowed or changed. Rather, our recent cases illustrate the customary understanding of the auto exception. For example, we have suppressed evidence from warrantless searches of vehicles where the officers first realized the connection between the vehicle and a suspected crime at a time *later* when the vehicle was parked and without a driver behind the wheel. *See, e.g., State v. Pirtle*, 255 Or App 195, 296 P3d 625 (2013) (refusing to apply the automobile

exception, although the pickup was moved while police were on the scene, because police did not connect the pickup to a crime until the pickup was, again, parked and unoccupied); *State v. Groom*, 249 Or App 118, 122, 274 P3d 876, *rev den*, 352 Or 665 (2012) (refusing to apply the automobile exception where police did not make connection between car and crime until after losing sight of car and later finding car parked with owner and a companion standing outside it and a man in the back seat and where there was no evidence the owner would have given the keys to the passengers or "whether either of them was ready, willing, and able to drive the car (and the evidence) away").

This court has reversed the suppression of evidence from a warrantless search of a vehicle, when, in classic fashion, an officer stopped a moving vehicle with reasonable suspicion of a crime. In *State v. Wiggins*, 247 Or App 490, 270 P3d 306 (2011), *rev den*, 352 Or 33 (2012), the problem was that the deputies did not search until about 25 minutes later. In the meantime, the vehicle had been left parked, unattended, and unoccupied in the driveway of acquaintances. The defendant's girlfriend had arrived demanding to take the vehicle. We rejected the defendant's argument that *Kurokawa-Lasciak* required suppression, and we held that the temporary break in the deputies' contact with the vehicle did not render the vehicle immobile.

In *State v. Finlay*, 257 Or App 581, 307 P3d 518, *rev den*, 354 Or 389 (2013), we borrowed from *Meharry*. This court rejected the defendant's argument "that the automobile exception requires a roadside stop of a mobile vehicle." *Id.* at 591. We rejoined that the police had first seen the truck when moving, and we added, "Officers prevented defendant's truck 'from resuming its journey' by seizing defendant and his two passengers." *Id.* at 592. We held that the automobile exception governed.

Most recently, in *State v. Baiz*, 268 Or App 401, 342 P3d 161 (2015), we borrowed from *Kurokawa-Lasciak*. This court concluded that a car was not mobile when encountered by police. We summarized:

"When the responding officers arrived, defendant's car was parked in a lot behind the bank. The engine was not

running, and no one occupied the vehicle. Defendant and his keys were not in the car when the officers arrived. The state conceded at trial that the officers had not seen the car move and that they only had a report from the bank manager that the car had arrived at some time in the past. Given that it was parked, immobile, and unoccupied at the time the officer first encountered it in connection with a crime, the car in this case was not 'mobile' as required under the automobile exception."

*Id.* at 405. We reversed and remanded, holding that the trial court erred in denying the motion to suppress.

In sum, none of these recent cases, including *Meharry* and *Kurokawa-Lasciak* themselves, suggests a narrowing of the automobile exception to the point of today's decision whereby "mobile" becomes strictly synonymous with "moving."

## ANALYSIS

There is an appropriate irony in the fact that *Kurokawa-Lasciak* began its analysis recognizing that the Court of Appeals had read too broadly by interpreting *Meharry* so as to view a car to be mobile "'as long as it is operable.'" *Kurokawa-Lasciak*, 351 Or at 185-86. Today, the majority reads too narrowly by interpreting *Kurokawa-Lasciak* as reinterpreting *Meharry*, so as to view a car as mobile only if seen moving when the police encounter it. It is here where the overcorrection occurs.

The majority interprets *Kurokawa-Lasciak* as if the Supreme Court had looked back to characterize *Meharry* and draw from it so as to contrast two separate situations. In one scenario, the majority reads *Kurokawa-Lasciak* to refer to the first portion of the *Meharry* facts, where the officer saw defendant's van drive past before he could catch up with it. The majority reads *Kurokawa-Lasciak* to say that "[t]he van in *Meharry* came within the Oregon automobile exception because * * * it was moving." 269 Or App at 716. In the second scenario, the majority refers to the second portion of the *Meharry* facts, where the officer caught up with the defendant's car after she had parked, stepped out, and entered the convenience store. The majority then declares that "the court *explained* in *Kurokawa-Lasciak* that the

status of the van in the parking lot was insufficient to bring the van within the Oregon exception." 269 Or App at 716 (emphasis added); *see also id.* at 714-15. From this reading of *Kurokawa-Lasciak*, the majority is compelled to conclude that the case at hand is an echo of the sorry, second scenario which the Supreme Court has expressly condemned.

The majority's view may not be an entirely unreasonable, albeit an after-the-fact *interpretation* that might be extrapolated from the *Kurokawa-Lasciak* summary of *Meharry*. But that deconstructionist reinterpretation is not actually to be found in the text of the decision in *Kurokawa-Lasciak* itself. *See Kurokawa-Lasciak*, 351 Or at 191-93. The Supreme Court did not treat the facts in *Meharry* as if the opinion were a contrast of two separate cases being decided.[6] The court looked at the whole of the *Meharry* circumstances, from beginning to end, as one case. *Kurokawa-Lasciak* did not declare half of the facts in *Meharry* to be a constitutional violation. *Kurokawa-Lasciak* did not pose or answer such a hypothetical question about *Meharry*. Therefore, there is, in reality, no *Meharry* "half-case" that ought to compel the majority's conclusion.

Although there is little harm in breaking *Meharry* into separate hypothetical scenes for analytic discussion, to project an after-the-fact interpretation *into* the text and then declare the decision-making already expressed in that text serves to deprive the reader of the chance to make an independent interpretation from the text of *Meharry*. One alternate and appropriate interpretation is that *Meharry* expanded the time frame to include in consideration evidence shortly before the police arrive at the scene of the vehicle, when other evidence indicates that the vehicle, now found stopped, had just been moving.

For its part, *Kurokawa-Lasciak* simply rejected the proposition that a vehicle could be searched if it was merely "operable." *Kurokawa-Lasciak*, 351 Or at 185, 190, 193-94.

---

[6] Often the Supreme Court will take two separate cases and write a single combined opinion in which the facts in two cases are compared or contrasted. *See, e.g., State v. Lawson/James*, 352 Or 724, 291 P3d 673 (2012) (admissibility of eyewitness identification).

The decision did not declare that a vehicle must necessarily be caught moving. It did not renounce *Meharry*, nor cast doubt upon any of our precedent *other than* our intermediate decision in *Kurokawa-Lasciak* itself. If the Supreme Court had intended to question or overrule all prior case law applying Oregon's auto exception, it would have said so. It did not. *Meharry* and *Cromwell* are still good law.

To now require that the police *see* a vehicle in motion, as the majority requires, imposes an arbitrary test that rules out equally strong, objective proof of the same fact. In *Meharry*, an officer used sense organs to *see* a van in motion, although he did not reach the van until a minute or two later—a block and a half later—by which time the van had become parked and unoccupied. The search was valid. 342 Or at 175. In this case, an officer used sense organs to *see* an empty parking area and to *see* the defendant's car in the same once-empty spot one minute later. In both cases, the officer's senses provide objective evidence that the car has been moving just before the officer actually contacts the driver and her vehicle. There is no substantive difference between *Meharry* and this case. Because a warrantless search was permitted in *Meharry*, a warrantless search should be permitted here.

It is unfortunate that the dispute turns on a single word in common usage. As the majority notes, the term "mobile," in ordinary usage, includes both a thing that is moving and a thing that is capable of moving. *See, e.g., Webster's Third New Int'l Dictionary* 1450 (unabridged ed 2002). Yet, despite this more qualitative meaning of "mobile," the majority reads *Kurokawa-Lasciak* to say that the "distinction" in a vehicle's "status" is "strictly binary." 269 Or App at 714. That is, the majority means a car is either moving or not moving.

To be sure, the term "mobile" includes "moving," but "mobile" is a less literal term. The term "mobile" cannot mean only "moving." "Mobile" describes, not just an activity, but a *quality*. If "mobile" meant moving, then the Supreme Court in *Kock* would have wasted the word "immobile" when requiring a warrant when a vehicle is "*parked, immobile* and

unoccupied." *Kock*, 302 Or at 33 (emphasis added). If a car is parked, then it cannot be moving. There would have been no reason to have used the word "immobile" in the phrase. To have used the word "immobile" implies that the term has added meaning.

At the risk of stating the obvious, the term "mobile" is a legal term of constitutional significance developed in case law. *See, e.g., Brown*, 301 Or at 274 (setting a constitutional standard). Unlike legislation, the term's character is not to be teased out of a dictionary. Its meaning is reflected in the line of cases recounted above. Oregon's cases reflect that "mobile" means more than simply "moving" at the moment the police encounter a vehicle. For example, our decision in *Cromwell* rejected the broad concept of "potential mobility," but it held that the truck, stopped in the road with a driver at the wheel, "was 'mobile' in that defendant could have driven away at any moment." *Cromwell*, 109 Or App at 659.

More importantly, the Supreme Court expressed in *Meharry* that mobility was something that a vehicle *retained* even when momentarily stopped. The court observed, as we did in *Cromwell*, that "there was no physical or mechanical impediment to the van's being driven away once [the officer] relinquished control over it. In short, the van *remained mobile* and the exigency continued." *Meharry*, 342 Or at 180 (emphasis added). Despite the fact the officer blocked the van to prevent it from leaving, "the van *remained mobile*[.]" *Id.* at 181. If "mobile" meant only "moving," then the Supreme Court could not have twice characterized the stopped van as *remaining* "mobile," even when the vehicle was actually parked and unoccupied. *See id.*

Reason requires that "mobile" means those things that a vehicle does when it is actively engaged in use. A vehicle is designed to stop, wait, and go while on its travels. As a traffic engineer would say, a car may "stand" when pausing in its travels to wait at a school's curb or in an airport's loading zone. A car may pause and wait only long enough for its driver to complete a lawful transaction or an illicit drug deal. When stopping, standing, or waiting, a running car occupied with a driver at the wheel certainly "remains mobile."

As a rhetorical device, talk of a "bright line" is seductive, because a simple rule would seem easy to articulate. A "bright line," however, is not a legal principle unto itself sufficient to justify a decision. It is just a metaphor. Recognizing its limitation, our cases speak often of "the *so-called* bright line." *See, e.g., Kock,* 302 Or at 32-33 (emphasis added); *Kurokawa-Lasciak,* 351 Or at 190 (emphasis added). Although always imperfect, the original use of the term was only meant to distinguish Oregon from the more ambiguous federal standard involving mere operability. *Brown,* 301 Or at 274 (stressing that the decision is not on federal constitutional grounds).[7] In *Meharry,* Justice Durham observed in a concurring opinion that "mobility" was a "flexible criterion" that remained "controversial." He recognized that, because facts inevitably vary, "mobile" may turn on more than one fact. He offered that the *Brown* "decision oversold the notion that it would lead to certainty." *Meharry,* 342 Or at 181 (Durham, J., concurring). In other words, it is doubtful that anyone expected to achieve a "bright line" that would avoid uncertainty when a close set of facts falls on it, as does this case.

The hot "bright line" that the majority now adopts is not only unreasonable, it is likely to be problematic. Now that observed motion becomes the test, we should ask, what mischief or uncertainty will follow if police are taught to wait to catch the car in motion (as if that could work)? What ingenuity may be employed to delay or to recharacterize when the critical, first encounter by the police really occurred? The majority's rule might become a form of laser tag. Writing for the majority in *Burr,* Judge Edmonds responded, "It makes little sense to interpret the constitutions in a way that requires the officers to permit the vehicle to roll several feet before effecting the search." *State v. Burr,* 136 Or App 140, 149, 901 P2d 873, *rev den,* 322 Or 360 (1995).

---

[7] The majority finds "telling" that *Kock* had cited *California v. Carney,* 471 US 386, 105 S Ct 2066, 85 L Ed 2d 406 (1985), as indicative of the broader, federal standard, allowing a search of a stationary but operational vehicle in a public parking lot. 269 Or App at 717-18. The discussion in *Kock* went no further and made no special mention of the facts in *Carney.* The Oregon Supreme Court in *Kock* did not recount that defendant Carney happened to occupy his motor home or that it seems to have been parked a good while (*i.e.,* under police surveillance for an hour and a quarter). Instead, the court in *Kock* drew its line holding that a warrant was required when a car was "parked, immobile and *unoccupied.*" 302 Or at 33 (emphasis added).

The majority would suggest that no harm follows a narrowed automobile exception, because police can use the exigency exception. The state, however, did not rely on the exigency exception in this case. Whether or not that was just a poor choice, it is a reminder that one concern of both the exigency exception and its variant, the automobile exception, has always been to avoid the loss of evidence in evanescent circumstances. To narrow the automobile exception risks losing evidence unnecessarily. To narrow the automobile exception is to roll the clock back and create greater uncertainty. To force more reliance on the exigency exception means troubling witnesses, police, defendants, and courts with more arguments founded in case-by-case quarrels over exigent circumstances. In a perfect world, similar circumstance would be decided similarly; in the real world, inconsistent decisions will happen. All that was the headache that Oregon's automobile exception was intended to prevent in the first place. *See Brown*, 301 Or at 276-77. Lost evidence and greater uncertainty could ensue as a consequence of the majority's new standard.

## APPLICATION OF THE AUTOMOBILE EXCEPTION

Until now, no case has presented these facts. Perhaps, reasonable disagreement about the proper application of Oregon's automobile exception is predictable, and, certainly, overcorrection is forgivable. But our case law should have compelled a different answer on these facts.

The undercover officer saw defendant's Jeep only a minute after it had arrived in the front area of the parking lot. The vehicle's presence was new. The officer recognized the silver Jeep that the informant had predicted for the transaction, and he witnessed Compton leaning through a window engaging in a transaction. He had a basis to suspect that defendant and the vehicle were involved in crime. The vehicle was not "parked" in any conventional sense of the word. The Jeep was positioned askew across several parking spaces. At most, the Jeep was stopped.

The vehicle was certainly not "unoccupied." Defendant and her passengers had not left the Jeep, like the defendants in *Kock* and *Kurokawa-Lasciak*.

From all indications, the presence of the Jeep was temporary, and it was still operating. When police first encountered the Jeep, defendant sat at the steering wheel, the key was in the ignition, and the engine was running. Defendant asked to leave. The Jeep had paused only long enough to accomplish the transaction. Although the officer had not seen the Jeep in motion a minute before, these surrounding facts objectively confirmed that the Jeep was "mobile."

When first seen, defendant's Jeep was no less "mobile" than a car pulled up to a drive-up window, a car waiting at a curb for a passenger, or a car stuck in a traffic jam behind an accident. The Jeep was stopped but "mobile" like the truck in *Cromwell* with its parking lights on, stopped in the middle of the dead-end road. With a shift of gears, the vehicle could have been gone. Just as the court in *Meharry* observed that "no physical or mechanical impediment" prevented the vehicle's departure, so, too, defendant's Jeep "*remained* mobile." *Meharry*, 342 Or at 180 (emphasis added). Like the girlfriend in *Wiggins*, who demanded to take the defendant's vehicle, defendant here demanded that her mother take her purse and car before the search would be completed. Because defendant remained in the driver's seat and readily could "resum[e] [her] journey," this was not a situation requiring a warrant. *Id.*

Although these facts are new, the formulation has long been established. Police may search an automobile, which is mobile when encountered, when they have probable cause to believe it contains evidence of a crime. *Brown*, 301 Or at 276. "Mobile" does not necessarily mean "moving," insofar as a vehicle "remains mobile" when police encounter it "shortly after" they know it has been moving. *Meharry*, 342 Or at 180; *see Finlay*, 257 Or App at 591; *Cromwell*, 109 Or App at 659. Mobile does not mean mere operability, nor "potential mobility," but "mobile" is not synonymous with "moving." Mobility can be demonstrated by immediate circumstances other than just seeing movement at the moment when the police first encounter the vehicle. To be precise, if a vehicle is still operating, with a driver at the steering wheel and the engine running, and police have objective

evidence that the vehicle has moved recently or will move imminently, then that vehicle "remains mobile."

In this case, defendant's Jeep should have been recognized to be "mobile." It was not "parked, immobile and unoccupied." *See Meharry*, 342 Or at 180; *Kock*, 302 Or at 33. The automobile exception should have applied. The trial court did not err in denying defendant's motion to suppress. Because the majority reaches the contrary conclusion, I must reluctantly and respectfully dissent.

Ortega, Sercombe, Hadlock, Tookey, and Garrett, J., join in this dissent.